346 So.2d 228 (1977)
Sadie Gertler, wife of/and David GERTLER
v.
CITY OF NEW ORLEANS et al.
No. 7925.
Court of Appeal of Louisiana, Fourth Circuit.
April 13, 1977.
Rehearing Denied June 7, 1977.
*229 Emile J. Dreuil, Jr., New Orleans, for defendant-appellant.
Chaffe, McCall, Phillips, Toler & Sarpy, Peter Frank Liberto, New Orleans, for defendant-appellant.
Philip Schoen Brooks, City Atty., Henry W. Kinney, III, Jack P. Panno, Asst. City Attys., for defendant-appellant.
Gertler & Gertler, M. H. Gertler, New Orleans, for plaintiffs-appellees.
*230 Before SAMUEL, SCHOTT and BEER, JJ.
BEER, Judge.
The chronological resume contained in the trial court's Reasons for Judgment is accurate. It states:
"This is a hearing on a petition for Writ of Certiorari and Review.
"In the Petition for Review on a statement of the case, it is alleged that in July, 1974, one David Gertler on behalf of Sadie Gertler, his wife, made an application for non-structural repairs on property designated as 605 Harrison Avenue, which also fronts on 6301 Louis XIV Street in the City of New Orleans.
"The Department of Safety & Permits issued Building Permit Number 6804, in connection with the said non-structural repairs, and on September 19, 1974, while the repairs were going on, a Miles J. Kehoe filed an appeal from the decision of the Department of Safety & Permits.
"A hearing was held on September 19, 1974, in which the petitioner, David Gertler, and several neighbors appeared and gave various statements as to their position on the property designated as 605 Harrison Avenue. After a hearing on the matter, the Board of Zoning Adjustments upheld the appeal of Miles J. Kehoe against the decision of the Director of Safety & Permits to revoke the Building Permit issued.
"The Gertlers applied to this Court for the Writ heard herein. This Court set the return date on the Writ 8 November 1974. A copy of the proceedings on the return of the Writ of Certiorari was filed by the City of New Orleans, through the Department of Safety & Permits.
"This Court issued an Order asking for memorandums to be submitted not later than January 6, 1975, in connection with the issues before the Court. After all memorandums had been received, this Court called another pre-trial conference and set the matter for trial to be tried by the Court de novo. This pre-trial was set on January 27, 1975, and the matter was set for trial to begin April 10, 1975."
The trial court also observed:
"Prior to the beginning of the hearing, the attorney for Mr. Kehoe and the attorney for the City of New Orleans objected to the Court hearing this matter de novo and took the position that the case should be reviewed solely on the record returned under the Writ of Certiorari. This Court took the position that, under the statute in question it had the right to hear the matter in its entirety and, therefore, overruled the objection of Mr. Kehoe and the City of New Orleans."
Proceeding on this basis and, thereafter, making factual findings different than those made by the Board of Zoning Adjustments, the trial court concluded:
"To sum up this Court finds that Dr. Armand Suarez conducted a dental office at the Harrison address and that the said dental office, the use thereof, was designated a legal non-conforming use, that at the time the Gertlers purchased the property it maintained the same status.
"It is the Court's belief that under the Comprehensive Zoning Ordinance of 1970, Article 12, Section 4, et seq., a non-conforming use of a building may be changed to another non-conforming use. In addition, the Court believes that there were no structural alterations made in violation of any city zoning ordinance.
"Therefore, it is the opinion of the Courts that the decision by the Board of Zoning Adjustments adopted at the meeting held September 24, regarding the herein matter, is hereby annulled, revoked, and set aside, and a Board of Zoning Adjustment's decision to uphold the appeal of Miles J. Kehoe is hereby reversed.
"It is further the opinion of the Court that the resolution which directed the director, Edward C. Kurtz, of the Safety & Permits Department to revoke the `Use and Occupancy Permit Number 6302,' is hereby annulled, revoked, and set aside."
The Louisiana Constitution of 1974 provides in Art. 5, Sec. 16:

*231 ". . . (A) Original Jurisdiction. Except as otherwise authorized by this constitution, a district court shall have original jurisdiction of all civil and criminal matters. . . .
(B) Appellate Jurisdiction. A district court shall have appellate jurisdiction as provided by law."
LSA-R.S. 33:4727 provides for the legislative creation of boards of adjustment, and further provides for a review procedure for those aggrieved by any decision of such boards:
"Any person or persons jointly or severally aggrieved by any decision of the board of adjustment, or any officer, department, board, or bureau of the municipality, may present to the district court of the parish or city in which the property affected is located a petition, duly verified, setting forth that the decision is illegal, in whole or in part, specifying the grounds of the illegality. The petition shall be presented to the court within thirty days after the filing of the decision in the office of the board. Upon the presentation of such petition the court may allow a writ of certiorari directed to the board of adjustment to review the decision of the board of adjustment and shall prescribe therein the time within which a return may be made and served upon the relator's attorney, which shall be not less than ten days but which may be extended by the court. The allowance of the writ shall not stay proceedings upon the decision appealed from but the court may, on application, on notice to the board and on due cause shown, grant a restraining order. The board of adjustment shall not be required to return the original papers acted upon by it, but may return certified or sworn copies thereof or such portions thereof as may be called for by the writ. The return shall concisely set forth such other facts as may be pertinent and material to show the grounds of the decision appealed from and shall be verified. If, upon the hearing, it shall appear to the court that testimony is necessary for the proper disposition of the matter, it may take additional evidence or appoint a referee to take such evidence as it may direct and report the same to the court with his findings of fact and conclusions of law, which shall constitute a part of the proceedings upon which the determination of the court shall be made. The court may reverse or affirm, wholly or in part, or may modify the decision brought up for review. Costs shall not be allowed against the board unless it appears to the court that it acted with gross negligence, or in bad faith, or with malice in making the decision appealed from. All issues in any proceedings under this section shall have preference over all other civil actions and proceedings. Amended by Acts 1968, No. 240, Sec. 1."
The City of New Orleans has enacted a Comprehensive Zoning Law (as amended in 1970) which provides (in Art. 13, Sec. 16, as well as Art. 15, Sec. 2.4, Subsection 5) that:
"Any person or persons, or any officer, department, commission, board, bureau, or any other agency of the City of New Orleans jointly or singularly aggrieved by any decision of the Board of Zoning Adjustments may present to the Civil District Court of the Parish of Orleans, within thirty (30) days after filing of the decision in the office of the Board, a writ of certiorari asking for such relief and under such rules and regulations as are provided for such matters in appropriate legislation of the State of Louisiana."
In State v. Board of Zoning Adjustments, 251 La. 691, 206 So.2d 74 (1968), plaintiffs applied for a writ of certiorari to review a decision of the Board of Zoning Adjustments for the City of New Orleans which had granted a variation from the zoning requirements. The Civil District Court for Orleans Parish issued the writ and reversed the decision of the board. On appeal, this court reversed. The Supreme Court granted certiorari, reversed us, and observed:
"(1) The instant law, supra, is sua generis. It pertains to special matters zoning and must be strictly construed. The Board of Zoning Adjustments is an administrative body which renders decisions.

*232 There is no provision in either Section 6 of Article XXVII of the Comprehensive Zoning Ordinance, City of New Orleans, or LSA-R.S. 33:4727, providing for a trial de novo of the matters heard before and decided by the Board of Zoning Adjustments. However, both provide for application for certiorari to the district court.
'Certiorari is in the nature of an appellate process; it is a method of obtaining review, as contrasted to a collateral assault. * * *
' * * *
'The function of a writ of certiorari is to correct substantial errors of law committed by a judicial or quasi-judicial tribunal which are not otherwise reviewable by a court. Its purpose is to review the findings and acts of inferior tribunals and officers exercising judicial or quasi-judicial functions, in order to determine whether their jurisdiction has been exceeded, or to ascertain whether the evidence furnishes any legal and substantial basis for the decision of the inferior tribunal.
' * * * ` 14 Am.Jur.2d Certiorari, Sec. 2 Nature and office of writ, pp. 778-779.
`Certiorari is an extraordinary writ offering a limited form of review, its principal function being to keep inferior tribunals within their jurisdiction.' 14 C.J.S. Certiorari § 2, p. 122.
'The Supreme Court, the Courts of Appeal, and each of the judges thereof, subject to review by the court of which he is a member, and each district judge throughout the State * * * may also, in aid of their respective jurisdictions, original, appellate, or supervisory, issue writs of * * * certiorari * * * and where any of said writs are refused, the appellate courts shall indicate the reasons therefor.' Art. VII, Sec. 2, La. Const. of 1921.
'Supervisory writs may be applied for and granted in accordance with the constitution and rules of the supreme court and other courts exercising appellate jurisdiction.' Art. 2201, Code of Civil Procedure. `* * * Primarily, the province of that writ is to "pronounce on the validity of a judicial proceeding." * * * This writ is granted only in case "the suit is to be decided in the last resort, and where there lies no appeal, by means of which proceedings absolutely void might be set aside," * * * ` State ex rel. Wells-Fargo Exp. Co., et al v. Martin, Justice of the Peace, 48 La.Ann. 1249, 20 So. 729.
(2) It follows that the Civil District Court for the Parish of Orleans acted as a reviewing court in an appellate capacity when it heard the writ of certiorari previously granted by it. Under LSA-R.S. 33:4727, it was permitted to take additional evidence for the proper disposition of the matter. Original jurisdiction was therefore in the Board of Zoning Adjustments and not in the district court."
Then, in Bowen v. Doyal, 259 La. 839, 253 So.2d 200 (La.1971), Richard Bowen instituted, by original petition, a suit in the district court of his domicile seeking review of an adverse ruling of the Board of Review of the Division of Employment Security (Louisiana Department of Labor). The district court, on its own motion, dismissed the suit for lack of jurisdiction. The Supreme Court reversed. Citing Art. 1, Sec. 6 of the Louisiana Constitution of 1921 (now Art. 1, Sec. 22 of the Louisiana Constitution of 1974), the Court held that there is a "presumption that all administrative determinations are reviewable by the court (W)e must not only favor but preserve the right of review." The Court went on to distinguish between "judicial review" and "judicial appeal" concluding that when the district courts review the adjudications of administrative bodies, they exercise their original jurisdiction, and courts of appeal and the Supreme Court provide the "only appellate judicial review of administrative matters."[1] *233 This was followed by River Oaks-Hyman Pl. H. Civ. A. v. City of New Orleans, 281 So.2d 293 (La.App. 4th Cir., 1973), in which we interpreted Bowen v. Doyal to hold that "when a district court reviews a decision of an administrative body, it is exercising `exclusive original jurisdiction.'" We further observed that "(c)ertainly the Zoning Board is an Administrative Agency."
Magnum Corp. v. Dauphin, 293 So.2d 582 (La.App. 3rd Cir., 1974) writs den. 295 So.2d 813, followed River Oaks and concluded that even though the Louisiana Constitution:
". . . does not specifically grant appellate or supervisory jurisdiction to the district courts to review decisions of administrative boards, such as Boards of Zoning Adjustment * * * In view of the decision in Bowen v. Doyal we conclude that district courts have original jurisdiction . . . to review the decisions of Boards of Zoning Adjustment created pursuant to the provisions of LSA-R.S. 33:4721 et seq. The district courts have original jurisdiction to review decisions of those Boards, we think, despite the fact that LSA-R.S. 33:4727 authorizes only a review by the district courts by means of a writ of certiorari * * * The district court may issue a writ of certiorari in aid of its original jurisdiction in that type case."
But, even if the district court has "original jurisdiction," it must, generally, accord a presumption of regularity to the decisions of boards of adjustment. This presumption is rebuttable. However, no reviewing court can, out of hand, simply substitute its own judgment for that of a zoning board or other properly constituted and validly functioning administrative agency. It must first determine or establish whether or not the decision of the board or administrative agency is supported by substantial and competent evidence adduced in proceedings which are regular and orderly. See Anderson, American Law of Zoning, Vol. 3, Secs. 21.16 et seq., (hereafter, "Anderson"), and particularly the following:
"While the scope of review in appeals from a board of adjustment is generally a narrow one, limited to a determination of whether the board's decision was arbitrary, unreasonable, or capricious, and whether the record contains substantial evidence in support of the findings of the board, some enabling acts provide for a broader review, including the taking of additional evidence by the reviewing court. The Standard State Zoning Enabling Act provides that if it shall appear to the court that testimony is necessary for the proper disposition of the matter, it may take or appoint a referee to take such evidence as it may direct and report the same to the court with his findings of fact and conclusions of law, which shall constitute a part of the proceedings upon which the determination of the court shall be made. Nearly two-thirds of the states have adopted this language, or some variation of it. These provisions have broadened the scope of review and blurred its dimensions.
"Some courts have construed provisions for the taking of additional testimony as authorizing a trial de novo by the reviewing court. Other courts have viewed the scope of review more narrowly, saying that notwithstanding the provision for the taking of new evidence, `there is nothing to indicate that the Legislature intended to change the office of the writ (of certiorari) so as to make it operate as an appeal,' and that a trial de novo is not authorized." (Anderson, supra, Sec. 21.19) (Citations omitted.)
In White v. Louisiana Public Service Commission, 259 La. 363, 250 So.2d 368 (1971), the Supreme Court, acting on an appeal from a district court which had affirmed orders of the Louisiana Public Service Commission, stated:
"Ordinarily, review of administrative rulings does not even allow the trial court or this court to make independent findings of fact where there are findings of fact in the record, unless there is a showing that the findings of fact were arbitrary and unreasonable and made without substantial evidence."
*234 The genesis of this approach is traceable, we believe, to the Administrative Procedure Act (LSA-R.S. 49:951 et seq.). Sec. 964(G) of the Act provides that:
"The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
* * * * * *
(5) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(6) manifestly erroneous in view of the reliable, probative and substantial evidence on the whole record.
In the application of the rule, where the agency has the opportunity to judge of the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency's determination of credibility issues."
Under Sec. 951(2) of the Act, the word "Agency" is defined as "each state board, commission or department which makes rules, regulations or policy . . . pursuant to . . . the constitution or laws of the United States or the constitution and statutes of Louisiana, except the Legislature or any branch, committee or officer thereof and the courts."
Courts, on occasion, have characterized a zoning board as an "administrative agency." See River Oaks-Hyman Pl. H. Civ. A. v. City of New Orleans, supra. LSA-R.S. 33:4727 provides that the district court may issue a writ of certiorari directed to the Board of Adjustment to review the decision of the board and provides that the court may reverse or affirm, wholly or in part, or may modify the decision brought up for review. Courts have used the language of the Administrative Procedure Act in the adjudication of matters stemming from a decision of a zoning board. See Times Picayune Pub. Corp. v. City of New Orleans, 316 So.2d 147 (La.App. 4th Cir., 1975); Nassau Realty Co. v. City of New Orleans, 221 So.2d 327 (La.App. 4th Cir., 1969); River Oaks-Hyman Pl. H. Civ. A. v. City of New Orleans, 288 So.2d 420 (La.App. 4th Cir., 1974) writs ref. La., 290 So.2d 909; McIntosh v. City of New Orleans, Dept. of Regulatory Inspection, 188 So.2d 183 (La.App. 4th Cir., 1966); and Reeves v. North Shreve Baptist Church, 163 So.2d 458 (La.App. 2nd Cir., 1964). Characteristic of this approach is Nassau Realty Co. v. City of New Orleans, 221 So.2d 327 (La.App. 4th Cir., 1969), wherein the owner of a lot was denied a permit variation from the requirements of the zoning ordinance and therefore sought a writ of certiorari from the Civil District Court for the Parish of Orleans. The district court (Judge David Gertler) dismissed the suit. On appeal, we affirmed the trial judge's decision and adopted the trial court's reasons for judgment which read, in part, as follows:
"This Court will not substitute its judgment for that of the administrative tribunals in the absence of a showing by plaintiff that the administrative tribunal was arbitrary and capricious, or that it abused its discretion."
Although the Administrative Procedure Act provides a basis for the reversal of a board-type decision whenever it is "[m]anifestly erroneous in view of the reliable, probative, and substantial evidence on the whole record," the Act applies to "state" boards, commissions or departments and not, necessarily, to municipal administrative boards.
Should we continue to analogize the zoning board to "state" boards, and thereby vicariously adopt the quoted language of the Administrative Procedure Act?
If so, then we must consider both records that of the board and that of the district court in order to finally determine if the board manifestly erred within the definition of the Administrative Procedure Act. To do this, we must address the question of whether or not the Board of Zoning Adjustments was arbitrary and capricious in making the factual determination that Dr. Suarez had ceased practicing as a dentist at the location in question for a period of more than six months prior to the sale, *235 thereby obviating the new owner's right to make a non-conforming use of the premises.
The following testimony adduced at the board hearing and trial significantly relates to this issue:
Mr. David Gertler, a party plaintiff and husband of Sadie Gertler, first visited the property in question during the latter part of December, 1973, at which time the door to the dentist's office was open. (Tr. Vol. IV, p. 111.) At that time, the dentistry equipment was still in the office and the plumbing and electrical facilities were still operational. (Tr. Vol. IV, p. 112.) Mr. Gertler had visited the premises only twice prior to the sale thereof, and at both times, noted Dr. Suarez seated and reading in an area to the rear of the dentist office (marked with an "o" on the Farnet plan, Exh. P-16) (Tr. Vol. IV, pp. 112, et seq., and 123, 137), but acknowledges that he never saw any patients. (Tr. Vol. IV, p. 138.) On cross-examination, Mr. Gertler acknowledged that he had no personal knowledge concerning the use of the premises prior to the December, 1973 visit. (Tr. Vol. IV, p. 177.)
Mr. Gertler was the preparer of the affidavit which the Suarezes had signed and which was admitted into evidence. (Exh. P-7.) This affidavit was subsequently notarized by Mr. Gertler outside the presence of the affiants. (Tr. Vol. IV, p. 122.) Emphasis was placed upon the fact that in May, 1974, the property was classified by Mr. Frank E. Robin, the Chief Building Inspector and Administrator of the Department of Safety and Permits, as a non-conforming use based solely upon the affidavit signed by Mr. and Mrs. Suarez. This allegation was corroborated by Mr. Robin at the trial. (Tr. Vol. I, pp. 94-95.)
Mrs. A. R. Suarez, the wife of Dr. Suarez, testified that from the time the house was built, Dr. Suarez had practiced dentistry there (Tr. Vol. III, p. 249). To that extent, the den area would sometimes be used as a waiting room for patients. (Tr. Vol. III, pp. 261, 275 and 309.)
It was the hope of Dr. and Mrs. Suarez to some day have another dentist occupy the premises (Tr. Vol. III, pp. 272, 285). They fully realized and were continuously aware of the non-conforming use of the premises as a dentist's office (Tr. Vol. III, p. 264).
Dr. Suarez's health began to fail in the early 1970's. Mrs. Suarez testified:
". . . when he went to the doctors in Florida, which was the year my daughter got married, that's four years ago, he was still practicing, he finished practicing that year and finished all his customers, all his patients." ". . . he had to finish his work, he wouldn't let it go." (Tr. Vol. III, p. 282.)
Furthermore, Dr. Suarez was advised that he should not do
". . . tedious work like grinding of the teeth . . . so that therefore he could do X-ray and he could look at a patient and so then when it got to the point that, you know, he was just taking this in to keep the place to be used as a dental office, he didn't want it to be closed because he wanted it to be either rented or he was going to sell it to a dentist, so knowing this, he would take X-rays at times for the family or friends, not really charging them anything, because he was disabled and the Veterans were paying him." (Tr. Vol. III, p. 256.)
Three or four months prior to the sale of the house, Dr. Suarez had ceased even to attend the office at all. (Tr. Vol. III, p. 256.)
Nevertheless, Mrs. Suarez attested that the dental equipment remained in the office and "the office was never closed to patients;" Dr. Suarez still had a license to practice, and the exterior signs advertising his practice continued to be maintained (Tr. Vol. III, pp. 256, 257, 263). Mrs. Suarez testified that the X-ray equipment could have been used until about three months prior to the sale of the house:
". . . he used it off and on at least one or two or three times a month, he'd use it, just maybe taking x-rays or something to keep that as a dental office and this is what he wanted to do. . . ." (Tr. Vol. III, p. 266.)
*236 "The only thing that he would use would be . . . the x-ray machine." (Tr. Vol. III, p. 267.)
Mrs. Suarez qualified this by testifying ". . . I wasn't with him all the time, let's be fair about it, I wasn't. I was working.. . ." (Tr. Vol. III, p. 267.)
Finally, Mrs. Suarez notes:
". . . he (Dr. Suarez) did most of the work for relatives and close friends, he did not do it because of the fact he was not well, he didn't want to chance on people and charge them and chance that he may hurt them in any way so he just went ahead and did it just to keep the office open." (Tr. Vol. III, p. 305.)
Mrs. Suarez explained that they expected to sell the office to a dentist,
". . . so therefore we kept that in use and in order to be able to sell it to a dentist, we weren't stupid, I mean my husband, you know, I knew it through someone told me that you got to keep the place open if you want to sell it to a dentist, well, my husband knew it too." (Tr. Vol. III, p. 307.)
Mrs. Suarez essentially admits that Dr. Suarez did X-raying "just . . . to keep the place open. . . ." (Tr. Vol. III, p. 308.)[2]
Mr. Philip Zollinger, a real estate broker, obtained a listing agreement with the Suarezes to sell the property in question on October 18, 1973. On that date, he visited the premises and returned on several subsequent occasions. (Tr. Vol. II, pp. 52, 63, 65.) Dr. and Mrs. Suarez were anxious to have a dentist buy the house (Tr. Vol. II, pp. 101, 102). When Mr. Zollinger visited the premises, he observed Dr. Suarez only in the residential portions thereof (Tr. Vol. II, p. 70) and never saw Dr. Suarez working (Tr. Vol. II, pp. 102, 103). To the best of Mr. Zollinger's knowledge, the electricity and water were still running between January 4 and `March 13, 1974 (Tr. Vol. II, pp. 71, 75-76).
At the district court hearing, seven neighbors (Otis A. Reed, Steven J. Toman, Mrs. Sybil Vinci, Mrs. Alice Gomila, Mr. Bryan O. Reynolds, Mr. Miles J. Kehoe, and Mr. John M. Coman, Jr.), who lived near the Suarez premises and had been in a position to observe any flow of patients to and from the dentist office, indicated that Dr. Suarez discontinued his practice several years prior to the sale of the property. The majority of these neighbors cited Dr. Suarez's disabling and deteriorating condition as the primary reason for the cessation of his dentistry practice. All of these neighbors testified, with only slight variations, that no persons nor patients were seen to have entered or exited the dentist office during the six-month period in question.
Eight neighbors, including four who later testified at the trial, testified before the Board to the effect that Dr. Suarez had definitely discontinued his dental practice for a period greater than six months prior to the sale to Mrs. Gertler. Reference to the transcript of the proceedings before the Board (which constitutes a part of the record before us) reflects testimony on the part of these witnesses to the effect that Dr. Suarez had not practiced for three to four years prior to the sale because of his illness.[3]
It is uncontested that Dr. Suarez's dental practice (after 1970) constituted a legal non-conforming use of the premises. This would lapse if such practice ceased for a continuous period of six calendar months. (Art. 12, Sec. 2 of the 1970 Ordinance.)
The Board, in its finding of fact, stated:
"Whereas, the Board also considered the overwhelming testimony of so many neighbors as to 6301 Louis XIV losing its non-conforming status, since the dentist *237 has been incapacitated for over six months. . . ."
However, the trial court concluded:
"that Dr. Suarez was a practicing dentist at 605 Harrison Avenue at the time or shortly before he sold the property to the Gertlers. In any event, he had practiced dentistry at this location at least six months prior to the sale of the property to the Gertlers, and, therefore, it did not lose its non-conformity for that reason."
Though this conclusion is not, in our view, manifestly erroneous, we must, also, observe that the record or proceedings before the Board does contain supportive testimony for the Board's finding that Dr. Suarez retained his dental equipment for the calculated purpose of simply maintaining the appearance of a dental office (thereby preserving its non-conforming status on a nonacceptable basis).
Though the records, when considered together, can support a conclusion that the equipment remained on the premises and the dental office remained "open" and that use was made of the X-ray equipment on limited occasions and signs on the front lawn and glass window were left in place; those records also can support a conclusion that few, if any, patients entered the premises after 1970; that none were actively treated for at least six months prior to the sale; that Dr. Suarez had himself delisted as a dentist from the yellow pages of the phone book in 1972; that by January, 1972, the house and dental equipment had been put up for sale (Tr. Vol. I, pp. 33, 34); that the income tax returns for 1973 fail to report any income from the practice of dentistry (Exh. Kehoe-11); that Dr. Suarez received Veterans Benefits for being totally disabled after 1972; and, finally, that Mr. Toman, who rented the apartment on the premises, never saw any patients nor heard any sounds resembling a dental drill.
Mr. Toman leased a portion of the property and allegedly sold magazine subscriptions by telephone from there. But this activity was proscribed by the then existing 1953 Ordinance. Note the distinction in State Ex Rel. Time Saver Stores v. Board of Zon. Adj., 261 So.2d 273 (La.App. 4th Cir., 1972) writs ref. 262 La. 311, 263 So.2d 47, where the building was used in whole for separate non-conforming uses. Here, Toman's use was violative of the 1953 Ordinance and not a legal non-conforming use.
The record lacks any relevant evidence indicating that the governing municipality had knowledge or written notice that the use of the premises violated any existing zoning ordinance such as to trigger the applicable prescriptive statute (Act 455 of 1956 as amended by Act 415 in 1962 as further amended by Act 54 of 1972 as presently found in LSA-R.S. 9:5625). The action initiated by Miles Kehoe had not prescribed. See Parish of Jefferson v. Bertucci Brothers Construction Company, 176 So.2d 688 (La.App. 4th Cir., 1965) writs ref. 248 La. 416, 179 So.2d 16; Parish of Jefferson v. Groetsch, 256 So.2d 722 (La.App. 4th Cir., 1972) writs ref. 260 La. 1204, 258 So.2d 552.
Addressing appellants' claim that the property had been structurally altered by Mrs. Gertler, we note that Art. 12, Sec. 4 of the 1970 Ordinance provides:
"If no structural alterations are made, a non-conforming use of a building may be changed to another non-conforming use . . ."
And Art. 14, Sec. 105 defines "Structural Alterations" as follows:
"Structural alterations. Any changes in the supporting members of a building, such as footings, bearing walls or partitions, columns, beams, or girders, or any substantial change in the roof or exterior walls, excepting such repair as may be required by an official governmental agency for the safety of the building."
The Board found:
"Whereas, it was noted that application for Use and Occupancy Permit on file in Safety and Permits Office states office space to be used will not exceed 702 sq. ft. This would be the space occupied by previous owner for dentist office. The members saw that the actual space to be used for dress shop exceeds this 702 sq. ft., incorporating a former apartment. Therefore, the cubical content is being *238 added to. The exterior, it is felt by the members has been altered enough to change the appearance of the area and does in their opinion adversely effect the neighborhood. By paving a former rear yard area in this RD-2 Two Family Residential District the Board feels a commercial appearance will replace a residential look. They are of the opinion that it would not be in keeping with the intent and purpose of the Ordinance to allow this business as cubical content and exterior appearance have been altered in this non-conforming building. . . ."
However, the district court concluded:
". . . the Court is convinced that no structural changes were actually made to the property in question."
The district court further opined that the changes effected by Mrs. Gertler have not materially affected an aesthetic view of the neighborhood nor have they done an unsightly job in connection with their redesign of the area in question.
Appellants allege three instances of "substantial structural alterations:"
1. The amount of glass paneling in the exterior wall doubled, substantially changing an exterior wall and constituting a change in a bearing wall.
2. An original brick wall inside the area had two door openings, each widened to 7 foot openings, constituting a change in a bearing wall.
3. The removal of the remaining interior partitions, the paving of the backyard, the altering of the page fence, and the construction of partitions in the family room (Area Y, P-16, Page B) when taken together constitute a substantial structural alteration.
Responding, appellees rely upon the testimonies of Messrs. Edward Goins (the general contractor for Mrs. Gertler) and Stewart Farnet (the architect for Mrs. Gertler) which reflect that no structural changes were made. Although changes were made in the walls; partitions were constructed for dressing rooms; the partitions separating the former dentist office from the apartment were removed; the roof was repaired; and doors widened, these alterations did not change the "supporting members" of the building and were, at most, a resectioning of the existing interior space or cosmetic improvements to the exterior.
We take note that the district court also dealt with the Board's finding that the space used by Mrs. Gertler for the dress shop exceeded that allowed by the Use and Occupancy Permit (i.e. 702 square feet). Specifically, the trial judge emphasized Mr. Ferran's (the Board Chairman) testimony concluding "that at no time when they (the Board) visited the premises did they actually measure the square feet now occupied by the Gertlers." Mr. Ferran testified that he "stepped off" the distances in addition to studying the carpenters' plans. The testimony of Mr. Gertler (Vol. IV, p. 151) (also p. 144) shows that a former den or family room, used by the Suarez family, and not used as a dentist office or by Mr. Toman for commercial purposes, was used by the boutique as dressing rooms and display area.

CONCLUSION
The 1970 Ordinance (Art. 12, Sec. 2) reads in part:
"Neither the intention of the owner nor that of anybody else to use a building or lot or part of either for any nonconforming use, nor the fact that said building or lot or part of either may have been used by a makeshift or pretended nonconforming use shall be taken into consideration in interpreting and construing the word `vacant' as used in this section."
Thus, if the Board had a proper evidentiary basis for concluding that the activities of Dr. Suarez were "makeshift or pretended," then the Board's final decision cannot be said to be impugned with caprice or arbitrariness. Generally, see In Re Coleman, 242 So.2d 602 (La.App. 4th Cir., 1970); Fuller v. City of New Orleans, 311 So.2d 466 (La.App. 4th Cir., 1975).
The Board, at a duly noticed and regularly conducted hearing, publicly received testimony from numerous persons on both sides. Then, ". . . the Board members felt that an on the scene inspection was *239 necessary to see for themselves and fully understand the case. After said inspection the members discussed scene and reviewed file. . . ."
Again, we note that if, on the basis of this inspection, the Board made factual findings which have support in the record, such findings cannot be said to be capricious or arbitrary.
Although, on one hand, we might disagree with the Board's findings and, on the other hand, ascribe no manifest error to those findings of the district judge, we are obliged to sustain the Board's conclusions unless the weight of the evidence in its entirety so strongly preponderates against such conclusions that it compels us to find an abuse of discretion on the part of the Board.
Even though the evidence adduced at the trial of this matter before the district court cannot be said to form a basis for a finding that the trial judge manifestly erred in his appraisal thereof, we, likewise, can not conclude that the Board acted arbitrarily, capriciously or with any calculated or prejudicial lack of discretion. For this reason, we must reverse the decision of the district court and reinstate the decision of the Board.
Accordingly, it is ordered that the judgment of the Civil District Court for the Parish of Orleans, read, rendered and signed on June 6, 1975, be and the same is hereby annulled, revoked and set aside, and it is further ordered that the resolution adopted by the Board of Zoning Adjustments at a meeting held September 24, 1974, Re: Docket XXX-XX-XXXX Louis XIV St., RD-2 Two Family Residential District, be and the same is hereby reinstated.
REVERSED AND RENDERED.

ON APPLICATION FOR REHEARING
Before SAMUEL, SCHOTT and BEER, JJ.
PER CURIAM.
It is more likely than not that legal proceedings in a court of record will provide due process safeguards not necessarily available (or as vigorously enforced) in municipal zoning board proceedings.
Were we to perceive that the measure of our judicial deliberation was the weighing of the relative due process merits of those two proceedings, we would affirm the judgment of the Civil District Court.
However, in its twelve-page written reasons for judgment, the Civil District Court for the Parish of Orleans makes no reference whatsoever to any instance where the Board of Zoning Adjustments has limited or impinged upon the due process rights of applicants for rehearing. The Civil District Court for the Parish of Orleans determined that the evidence adduced in the proceedings before that court was more supportive of applicants' factual contentions. Had the Civil District Court for the Parish of Orleans made factual findings, supported by the record, that applicants' due process rights were materially or substantially impinged, such conclusions might have supported that court's ultimate finding that the Board's actions were arbitrary and capricious. Such was not the case.
The application for rehearing must be denied.
REHEARING REFUSED
NOTES
[1] Note, however, Art. 5, Sec. 16 of the Louisiana Constitution of 1974 previously quoted in this opinion.
[2] Mrs. Suarez did not testify at the Board hearing. Her first and only appearance as a witness was at the trial.
[3] See Board transcript: Emile Dreiul, pp. 3, 5; Miles Kehoe, p. 6; Sybil Vinci, p. 7; Otis A. Reed, pp. 7-8, 12; Joseph S. Casey, p. 8; Harold Lee, p. 9; John Kohlman, p. 9; Bryan O. Reynolds, p. 22 and his letter to Board dated September 16, 1974.