600 So.2d 69 (1992)
ELYSIAN FIELDS, INC.
v.
Marcia ST. MARTIN, in her capacity as Director of the Department of Safety and Permits, City of New Orleans, and the Board of Zoning Adjustments of the City of New Orleans through its Chairman, Clarence A. Smith; and its individual members R. Ray Orrill, Jr., Gretchen Bomboy, Mary Chachere, and Mildred Young.
No. 91-CA-0333.
Court of Appeal of Louisiana, Fourth Circuit.
January 30, 1992.
*71 William P. Quigley, New Orleans, Steve Bachmann, Grosse Pointe, Mich., and Corinne Van Dalen, New Orleans, for plaintiff/appellant.
Nadine M. Ramsay, Asst. City Atty., Dwight W. Norton, Deputy City Atty., Kathy Lee Torregano, Chief Deputy City Atty., William D. Aaron, Jr., City Atty., New Orleans, for defendant/appellee.
Gideon T. Stanton, III, Guste, Barnett & Shushan, New Orleans, for intervenor/appellee.
Before BARRY and CIACCIO, JJ., and BRYAN, J. Pro Tem.
BARRY, Judge.
Elysian Fields, Inc. (EFI) appeals the denial of a zoning variance which it sought to complete the second phase of a building renovation project.
In September, 1986 EFI, a non-profit corporation, purchased five buildings on Elysian Fields Avenue. The property had been a funeral home for many years with a legal non-conforming zoning status because no off-street parking was provided. The property is in the Historic Marigny/Treme Commercial District and zoned HMC-2 under the Comprehensive Zoning Ordinance of New Orleans (CZO).[1] EFI planned to convert the buildings into offices to house the operations of its three member organizations: the Association of Community Organizations for Reform Now (ACORN), Service Employees International Union Local 100, and Affiliated Media Foundation Movement (AMFM).
In 1987 EFI obtained a building permit to renovate several of the buildings and it was not required to provide additional parking space. In September, 1989 EFI applied for a building permit (for the second phase) which, according to EFI, was to add office space, a kitchen, board room, and an area to hold an annual meeting. Problems began when EFI was informed that 20 off-street parking spaces were required (pursuant to the CZO) because the Department of Safety and Permits (DSP) considered the second phase a separate project. The DSP denied the building permit and EFI sought a variance which was denied by the Board of Zoning Adjustments (BZA) after three public hearings on October 9, November 20 and December 11, *72 1989. EFI filed for certiorari in the district court, and Eugene Theriot, an adjacent property owner, intervened.
EFI appeals the district court's denial of certiorari based on five arguments:
(1) the court relied on representations of the DSP;
(2) the BZA's decision that its offices were not professional offices (allowed in HMC-2) was arbitrary and capricious;
(3) the BZA had no evidence that the renovation project was an impermissible expansion of a non-conforming use;
(4) EFI is deprived of the beneficial use of its property and thereby denied due process of law;
(5) the City was arbitrary and capricious by denying the permit, and the BZA's decision that EFI did not meet the conditions for a variance was not supported by the evidence.

THE LAW
Decisions of the BZA are afforded a presumption of validity. A reviewing court should not merely substitute its own judgment for that of the BZA unless there is a showing that the Board was arbitrary and capricious or abused its discretion. Buuck v. Board of Zoning Adjustments, Department of Safety and Permits, City of New Orleans, 537 So.2d 244 (La.App. 4th Cir. 1988); Lakeshore Property Owners Association v. City of New Orleans, Zoning Board of Appeal and Adjustments, 481 So.2d 162 (La.App. 4th Cir.1985), writ denied 484 So.2d 674 (La.1986).
The purpose of certiorari is to review the findings of boards and quasi-judicial tribunals to determine whether jurisdiction has been exceeded, or to decide if the evidence establishes a legal and substantial basis for the Board's decision. Gertler v. City of New Orleans, 346 So.2d 228 (La. App. 4th Cir.1977), writ denied 349 So.2d 885 (La.1977), cert. denied 434 U.S. 1068, 98 S.Ct. 1248, 55 L.Ed.2d 770 (1978).
Under the Administrative Procedure Act, a reviewing court may reverse or modify a board's decision if substantial rights of the appellant have been prejudiced because the decision is arbitrary or capricious or its findings are characterized by an abuse of discretion, or the decision is manifestly erroneous in view of substantial evidence in the record. Due regard shall be given to the agency or board's determination of credibility issues. La.R.S. 49:964 G; Gertler, 346 So.2d at 228.
Zoning laws are in derogation of the rights of private ownership. Schmitt v. City of New Orleans, 461 So.2d 574 (La. App. 4th Cir.1984), writs denied 464 So.2d 318 and 319 (La.1985). CZO Art. 7, Sec. 1 provides that low and medium density (HMC-2 districts are medium density under Art. 7, Sec. 2(6a)) office buildings are required to provide one parking space per 400 feet of floor area.
The BZA has the authority to consider applications for a variance from the CZO. La.R.S. 33:4727. CZO Art. 15, Sec. 2.3(1) provides:
Standards for Variances. The Board of Zoning Adjustments shall not authorize a Variance from the requirements of this Ordinance unless it shall make findings based upon the evidence presented to it that each special case shall indicate all of the following:
a. Special conditions and circumstances exist which are peculiar to the land, structure, or building involved and which are not applicable to other lands, structures, or buildings in the same zoning district.
b. Literal interpretation of the provisions of this Ordinance would deprive the applicant of rights commonly enjoyed by other properties in the same district under the terms of this Ordinance.
c. The special conditions and circumstances do not result from the actions of the applicant or any other person who may have or had interest in the property.
d. Granting the variance requested will not confer on the applicant any special privilege which is denied by this Ordinance to other lands, structures, *73 or buildings in the same district or similarly situated.
e. The variance, if granted, will not alter the essential character of the locality.
f. If the strict adherence to the regulation for the property would result in a demonstrable hardship upon the owner as distinguished from mere inconvenience.
g. The purpose of the variance is not based exclusively upon a desire to serve the convenience or profit of the property owner or other interested party(s).
h. The granting of the variance will not be detrimental to the public welfare or injurious to other property or improvements int [sic] the neighborhood in which the property is located.
i. The proposed variance will not impair an adequate supply of light and air to adjacent property, or increase substantially the congestion in the public streets, or increase the danger of fire, or endanger the public safety.
A non-conforming use is a use which lawfully existed prior to the enactment of a zoning ordinance and was maintained after the effective date of the ordinance although the continued use violates the new restrictions. City of New Orleans v. Elms, 566 So.2d 626 (La.1990). At the time of the application for a use and occupancy certificate, the Director of the DSP makes the initial determination as to the existence of a non-conforming use after the owner produces evidence attesting to that status. CZO Art. 12, Sec. 7.
To be entitled to a non-conforming use exemption the property owner has the burden to show that the property was lawfully subject to the non-conforming use at the time the zoning ordinance became effective and that neighboring property owners were aware of the use. Dudenheffer v. City of New Orleans, Department of Safety and Permits, 482 So.2d 175 (La.App. 4th Cir.1986).
Because a non-conforming use is inconsistent with the objective of a zoning ordinance which is to confine certain classes of buildings and uses to certain localities, it should be viewed narrowly and have all doubts resolved against continuation or expansion of the non-conformity in order to preserve the property rights of adjacent property owners. Continuance of the non-conforming use is the continuance of the same use and not some other use. Redfearn v. Creppel, 455 So.2d 1356 (La. 1984). In all districts except the Vieux Carre Districts (1990 revision adds Historic Marigny/Treme Districts to the exception), a non-conforming property may be changed to another non-conforming use of the same or more restrictive classification if no structural alteration is made. CZO Art. 12, Sec. 4. A building will lose its non-conforming status if it remains vacant for a continuous period of six months. CZO Art. 12, Sec. 2; Pailet v. City of New Orleans, Department of Safety and Permits, 433 So.2d 1091 (La.App. 4th Cir.1983), writ denied 440 So.2d 757 (La.1983). The burden of proving termination of a non-conforming use status by discontinuance is on the party urging it. Panzeca v. City of New Orleans, 580 So.2d 489 (La.App. 4th Cir. 1991), writs denied 585 So.2d 566 and 567 (La.1991).
According to CZO Art. 5, Sec. 26.2, property zoned HMC-2 shall be used only for specified purposes. The only relevant use was the first one listed, any use permitted in HMC-1, Historic Marigny/Treme Commercial District without floor area restrictions. CZO Art. 5, Sec. 25.2 listed permitted uses in an HMC-1 area, which includes number 8, professional offices.
CZO Art. 14, Sec. 2, which contains definitions, does not define business or professional offices. However, CZO Art. 5, Sec. 8.2 relative to permitted uses in the General Office District (RO) listed general business offices separately from professional offices.

THE RECORD
The record contains the following chronology. EFI's building permit application dated July 6, 1987 for renovation of 1024-26 Elysian Fields listed the existing commercial *74 use as "funeral home/vacant" and the proposed use as "business/offices." The plans were attached and EFI also submitted the Historic District Landmarks Commission's (HDLC) certificate of appropriateness dated July 2, 1987.
A December 8, 1987 letter from EFI's architect Norman Bissenden (of Waggonner & Ball) to Dale Rathke of EFI explained Bissenden's interpretation of the zoning ordinance:
Specifically, we interpret the requirements of the City's zoning ordinance for an office building of this size in an HMC-2 zone to be 37 parking spaces and 2 loading spaces. However, the ordinance allows for existing buildings which are non-conforming with regards to parking to be maintained or structurally altered provided the alteration does not increase the non-conformance.
Bissenden referred to the opinion of Fred Baker of DSP that if the zoning for parking and loading at the funeral home required more parking and loading spaces than the zoning for the office building, then there would be no requirement to provide additional parking or loading spaces. However, Bissenden noted that his discussion with Baker "did not advance past generalized information ...," and Bissenden recommended a meeting with Baker to discuss "the specifics of this project."
EFI's September 8, 1989 application for a building permit for 2116-18 St. Claude Ave. (the second phase) indicated the existing use was "vacant" and the proposed use to be "offices." The description of the work was: "Renovations (illegible) two existing masonry (illegible) steel warehouses (HDLC approved)." The HDLC certificate of appropriateness was dated September 6, 1989. In a document dated September 18, 1989 by Waggonner & Ball, funeral home and office parking requirements were compared. There was no mention that the property was intended for professional office use.
DSP's September 26, 1989 denial of the permit to convert the vacant warehouse into an office building (which included a waiver of 20 parking spaces) was signed by C. Livious. The same day EFI requested a variance from the provisions of Art. 7, Sec. 1 of the CZO which required 20 parking spaces. On the form the existing use was listed as "Warehouse" and the proposed use was "Office." Of the nine requirements listed on the variance form (which somewhat parallel the nine conditions set out in CZO Art. 15, Sec. 2.3(1)), EFI answered "No" to the first inquiry as to whether special conditions existed peculiar to its property and not applicable to other property in the same zoning district.
In a September 26, 1989 letter to DSP concerning the waiver of parking spaces, Bissenden explained that Cleveland Livious was familiar with the two phase project. Bissenden stated he had cleared the parking problem with Fred Baker, who was no longer with the DSP.
EFI submitted a petition signed by eight residents and/or business owners in the area which supports the requested variance. A petition by 25 tenants and property owners and a letter was submitted against any permitted use other than as a parking garage.
At the first public meeting on October 9, 1989 Bissenden (EFI's architect) stated that he had worked closely with the HDLC and DSP prior to beginning the renovation. Bissenden "checked the zoning ordinances for the area and determined that because of converting a funeral home to an office building, because we were not increasing the demand, uh, uh, increasing the requirements for parking, um, on the site, that we would not be required to provide additional parking spaces...." He said the funeral home (which required one parking space per 50 square feet) was converted to an office building (which required one parking space per 400 square feet), hence the demand for parking was not increased. Bissenden obtained the permit without opposition.
According to Bissenden, the first phase plans showed a "unitarian electrical system" which indicated a continuous project involving the entire property. After EFI began the first phase, Eugene Theriot, an adjacent neighbor who owned a po-boy *75 shop on the corner of Elysian Fields and St. Claude, spoke to Bissenden about the parking. At that point Bissenden contacted Fred Baker at DSP and verified that EFI was in compliance with the zoning ordinance. According to Bissenden, EFI was "grandfathered in" and Paul May and Cleveland Livious of the DSP so stated.
However, at the second hearing on November 20, 1989 Paul May of DSP testified that he reviewed the file and found nothing in the 1987 plans which indicated that EFI planned to change the parking garage into office space or an exhibit hall. He agreed with the City Attorney's interpretation of the ordinance that "a distinction can be made in the offices", i.e., business and professional. May stated that there was nothing in the file to indicate that DSP knew of EFI's intent to use the parking garage as office space when the original permit was issued in 1987.
Bissenden stated there was no complaint after the first phase. EFI planned the second phase and applied for a permit in September, 1989. Shirley Hastman of DSP declared that the second phase was the development of an accessory building and would require off-street parking (evidently twenty spaces). Bissenden contended the change was from a vacant storage building (according to Paul May), not a parking garage, to an office building. Bissenden did not think the change constituted an expansion of a non-conforming use.
Gretchen Bomboy, a member of the BZA, opined that EFI's proposed renovation was denied because a HMC-2 district only permits a professional office building, which she defined as a building occupied by one tenant (e.g. a surgeon, a dentist) who must be the owner. Bomboy claimed that the drawings of the "exhibit hall" which included six toilets appeared to be a meeting hall which was an impermissible expansion of a non-conforming use.
EFI (not represented by counsel until the third public hearing on December 11, 1989) argued that its member organizations were staffed by professionals, therefore the buildings were to be professional offices. EFI claimed that its use was the continuation of an existing non-conforming use which did not require additional parking. When asked about alternatives such as acquiring additional property, EFI conceded that adjacent property had been acquired but argued it provided no additional parking without demolition.
Kathy Torregano, assistant city attorney, testified and submitted her written opinion into the record. Under CZO Art. 5, Sec. 26.2 any use permitted in the HMC-1 district is permitted in the HMC-2 district, where the subject property is located. She claimed that a HMC-1 district permits professional offices only, not general business offices such as the EFI proposal. Because CZO definitions do not include professional business offices, Torregano looked to analogous uses in other CZO articles. Torregano pointed out that in a general office district (RO), general business offices were included separately from professional offices and concluded that the CZO drafters intended to distinguish between general business and professional offices.
Wade Rathke of Local 100 argued that professionals staffed the EFI offices. He stated: "This wasn't being used ... we don't [sic] have an idea the property was vacant for four or five years and they were telling me that before we ever purchased it." Rathke stated that EFI renovated the buildings and was now being "victimized by misunderstandings."
Eugene Theriot and other businessmen in the area spoke in opposition to the variance at the first hearing. He stated that his sandwich shop business suffered because visitors to EFI's building illegally parked in his private ten space parking lot and blocked his driveway. Craig Ripley stated he built a Walgreen's drugstore at the corner of St. Claude and Elysian Fields in 1988 and provided 46 parking spaces. He felt a waiver to EFI would worsen the already bad parking situation. Steve Prechter, representing Schwegmann's Supermarket, stated that the variance would worsen noncustomer automobiles being parked in Schwegmann's lot. Gary Delermo, president of the Faubourg-Marigny Improvement Association, asked the City to *76 enforce the parking requirement because of the parking shortage and complaints by property owners.
Theriot (represented by counsel at the second hearing) contended that the Board did not have authority to grant a variance because business offices were not permitted under HMC-2 zoning. He said EFI needed a map change by the City Council, not a variance. Theriot additionally argued that the plans submitted in 1987 did not put the City on notice that there would be a second phase which included the conversion of a parking garage into an office building. He submitted copies of the 1987 plans which merely labeled the garage as "BLDG 5" and did not indicate its development. He said EFI was "lucky" when it was permitted business office use (not permitted under CZO) in 1987.
Theriot stated the funeral home owner used the warehouse as a parking garage for limousines. He submitted an October 4, 1989 letter by James Morris, senior vice-president of Security Industrial Insurance Company, which acquired the Ranson Funeral Home property in the early 1970's and sold it in "the last few years." In the letter Morris stated that the garage had been used for parking because it was the only off-street parking available. Morris understood that area had been designated as a parking garage prior to his company's purchase of the property.
Also introduced into evidence was a copy of a March 19, 1988 Times-Picayune article entitled "Funeral home finds new life," which states that the Ranson Funeral Home was sold to Security Industrial Life Insurance Company in 1974, closed in 1982 and remained vacant until EFI's purchase in 1986. The article quoted Bissenden as saying that the funeral home had been vacant for more than five years prior to EFI's purchase in 1986. In its petition for a writ of certiorari, EFI declared in paragraph 7: "The Ranson Funeral Home site was purchased by EFI in 1986 for development as an office building, after having been vacant for a number of years."
The Board heard testimony and received documentation during the three public hearings and no additional evidence was presented to the district court.

RELIANCE ON PRIOR COMMUNICATION

(FIRST ARGUMENT)
We find no merit to EFI's first argument that it relied upon previous communications by DSP. EFI produced no evidence to support that assertion. Bissenden claimed that he relied on Fred Baker, who is no longer with DSP and was not called to testify. EFI submitted no affidavits or documentation to substantiate that Baker misled Bissenden.
Bissenden claimed that Paul May and Cleveland Livious of DSP informed him that Elysian Fields would be "grandfathered in." However, Cleveland Livious signed the denial of the building permit for the second phase and Paul May testified that there was nothing in the 1987 permit or the plans to indicate the full extent of the project and the future renovations including the parking garage conversion. May declared he was not aware of those plans at the time the first permit was given. EFI did not prove otherwise.

NON-CONFORMING USE

(THIRD ARGUMENT)
EFI argues that BZA's finding that the second phase involved an expansion of a non-conforming use was not supported by competent evidence.
The BZA did not state as its reasons for the denial that the second phase renovation would result in an expansion of a non-conforming use. Gretchen Bomboy, a member of the Board, strongly expressed that opinion at the end of the hearings, but another member stated he did not necessarily agree with that opinion but voted to deny the variance.
Converting a warehouse or parking garage into office space or a meeting hall would arguably constitute an expansion of the non-conforming use of that building. The BZA only stated that all the standards for a variance had not been met. Implicit *77 in its denial was a finding that the second phase did not qualify as a continuing non-conforming use or the waiver would not have been necessary.
We find more persuasive the fact that the property had lost its prior non-conforming use status. Theriot submitted James Morris' letter that the warehouse or garage had been used for parking prior to it being sold by his company. The Times-Picayune newspaper article states that Security Industrial Life Insurance Company closed in 1982 and the property remained vacant until EFI purchased it in 1986. According to the article, Bissenden declared that the former funeral home had been vacant five years. EFI submitted nothing to contradict the fact that the property had been vacant for at least 4 years. Wade Rathke testified to its vacant status and EFI's petition for a writ of certiorari declared that the property had been vacant for a number of years prior to EFI's purchase in 1986.
Under CZO Art. 12, Sec. 2 the non-conforming status would terminate if the building remained vacant for a continuous period of six months. The property lost its non-conforming use long before the application for the second phase building permit in 1989 and prior to the decision to allow the work in 1987.
This argument lacks merit.

PROFESSIONAL VS. BUSINESS OFFICE

(SECOND ARGUMENT)
EFI argues that BZA was arbitrary by finding its property was not used as professional offices. Although Gretchen Bomboy opined that EFI did not qualify as a professional office, the BZA only concluded that a variance was not proper.
Without non-conforming status, EFI was required to provide off-street parking space for the second phase pursuant to BZA Art. 7, Sec. 1, which listed only "[o]ffice or office building ...," and required a certain number of spaces if low or high density. According to the parties and the BZA, the number required at the time was 20 spaces. There was considerable argument at the hearings as to whether the property was being used for business offices (not a permitted use in the HMC-2 district) or professional offices (permitted use). CZO Art. 7, Sec. 1 makes no distinction. Mr. Theriot argued that EFI had a business office, needed a City Council map change to allow that use in an HMC-2 area, and the Board had no legal authority to grant a variance. The Board made no such decision. Regardless of the category, off-street parking must be provided unless EFI receives a waiver. The requirement to provide off-street parking precipitated EFI's request for a variance.
To classify the property as professional offices does not alter the fact that off-street parking must be provided unless a variance is granted. The original decision to allow the office (professional or business) in the HMC-2 district was made in 1987 and is not before this Court. The BZA made no determination as to which category EFI's property fits.
Whether the variance was properly denied is the only issue before this Court.

BENEFICIAL USE

(FOURTH ARGUMENT)
EFI's argument that it is being deprived of the beneficial use of its property and was denied due process of law has no merit. EFI presented nothing to support that claim. Its architect, Bissenden, only testified that EFI could not finish the renovations and use the property as intended and there was no space for off-street parking.
Bissenden claimed that the HDLC would not approve demolition of any structure on the premises; however, there was testimony that one structure had already been torn down with its approval.
Additionally, the denial of the variance was without prejudice and Elysian Fields can apply for a variance at a later date.

SUPPORT FOR VARIANCE DENIAL

(FIFTH ARGUMENT)
EFI's argument that the denial of the variance was not supported by sufficient and competent evidence and the Board acted arbitrarily lacks merit.
*78 According to CZO Art. 15, Sec. 2.3(1), the BZA shall not authorize a variance unless it makes all nine findings listed in the article. EFI negatively answered the first question on the variance application form as to whether its property had special circumstances which were peculiar to the structure and were not applicable to other buildings in the same zoning district. It presented no special conditions not present in other buildings in the area.
The ninth prerequisite is that the variance will not substantially increase congestion on public streets. There was ample testimony that a waiver of the 20 parking spaces would substantially increase congestion. A waiver would confer a special privilege which is prohibited by the fourth requirement.
The BZA did not find all nine conditions required for a variance. BZA's decision was not arbitrary or capricious and is supported by the record. The Board had a legal and substantial basis for its denial.

CONCLUSION
The BZA was not arbitrary and capricious. The evidence furnished a legal and substantial basis for its ruling. The trial court correctly denied certiorari and upheld the decision of the Board of Zoning Adjustments.
The judgment is affirmed.
AFFIRMED.
NOTES
[1] The 1970 Comprehensive Zoning Ordinance effective August, 1970 was most recently revised in 1990. The pre-1990 version used by the DSP and BZA when it denied the building permit and variance and cited in this opinion is the CZO revised as of May 5, 1986.